I'd like to focus on the Georgia v. Randolph issue this morning, and I think that the hard part of applying a Randolph to this case, as the government has pointed out in its briefing, is the Randolph opinion's repetition of phrases like physically present or at the doorstep, and the government argues that that is an absolute requirement if the Randolph rule is to be applied in any case, and certainly in this case. And of course, Ms. Thompson was not at the doorstep when she refused consent in this case. She was locked in a police car in the street. Did the government introduce in its case in chief any evidence that came out of the motel room? THOMPSON I believe the evidence that came out of the motel room, I think some of it had been at least ruled admissible. I'm not completely sure, and that's very embarrassing. I should know the record is that none of the material that came out of the motel room search was put into evidence until your client took the stand. KOTLER I think that may be correct, Your Honor. Certainly the case agent's testimony during the government's case in chief focused at least very, very largely, if not entirely, on the evidence that had been seized from Ms. Thompson's handbag at the time of her arrest. However, the government had obtained a ruling from the district court before trial that at least some of the evidence that was taken from the hotel room would be admissible should it choose to introduce that evidence. And before Ms. Thompson testified, the government obtained a later ruling from the district court permitting it to introduce a larger, more incriminating category of evidence that had also been seized from the hotel room, which it then did introduce during its cross-examination of Ms. Thompson. Kennedy But if the defense had not put on any case at all, that evidence wouldn't even be before the court, right? KOTLER That's right, Your Honor. However, I mean, when the government argues that in some sense this was an invited error, I think that that's a little bit off the mark, because a great deal of this evidence had been admitted before the trial began. And, again, and the jury, though, it hadn't been before the jury, but before Ms. Ruffin said a word in her own defense, the government had already obtained a ruling that really, no matter what she said, this evidence would come in. And this was a ruling ---- Kennedy This evidence could come in. KOTLER Could come in, exactly. I'm sorry, Your Honor. Kennedy But the government didn't put it in, so why isn't invited error a good argument? In other words, if the defendant had simply not said anything, none of this evidence gets in the record. KOTLER This evidence was permitted the district court permitted the government to introduce this evidence. It made it ---- Kagan I'm sorry? Kennedy Which it did not do. KOTLER That is ---- well, it did not in its case in chief. That's correct, Your Honor. I believe that's correct. But the government's request to introduce its larger category of evidence was a request that the government made, I think, on the morning that Ms. Ruffin ---- that Ms. Thompson was scheduled to testify. And while it's true that if Ms. Ruffin had not been ---- would not have been introduced unless the government ---- well, would not have been introduced, the defense was then faced with a situation in which, however it had planned its trial strategy with Ms. Ruffin testifying, it was now faced with this other, you know, this other category of evidence. And I think it's a little bit misplaced to say that it's an invited error because the evidence was found by the district court to be admissible just as a general rule without any kind of limitation on if Ms. Thompson testifies to X, then the government may introduce Y. Kennedy The law is pretty clear, though, isn't it, that the fruits of an improper search, a Fourth Amendment ---- assume a Fourth Amendment violation, that that kind of evidence, like a Miranda violative statement, can be used to impeach a witness who takes the stand, right? Yes. And your client took the stand and said that she was in ---- she was learning how to be a credit counselor. Yes. The facts are interesting. Doesn't that rebut that testimony? I'm sorry, Your Honor? Doesn't the evidence found in the hotel room rebut her testimony she was studying to be a credit counselor or whatever it was she was supposed to be doing? You could certainly characterize it as rebutting it or you could characterize it as casting doubt on the essential truthfulness of that statement. So why isn't it admissible under that theory? I'm sorry, Your Honor? Why isn't it admissible under that theory, even if it was subject to an illegal search and seizure? It's inadmissible under that theory, Your Honor, because it's ---- because it wasn't admitted specifically for the purpose under the district court's analysis of just rebutting whatever Ms. Thompson might say in her defense at trial. It was admitted under a theory that identity theft or that this ---- that this challenged evidence constituted evidence of a very ---- at a very broad level of identity theft and that presenting a ---- that writing someone else's name on a credit card convenience check was also a form of identity theft, that at this very broad level, pretending that you ---- you know, that a document is legitimate when it's not is the same as making a document, you know, to show that ---- to seem that it's legitimate when it's not. And our argument is, as we've said in our briefing, is that there can't be such a high level of generality that under both 404B and inextricable intertwinedness, the level of generality has to be something much, much closer, much, much more particular and specific, and that this really comes more under a Darrington analysis. I mean, in ---- Kennedy was charged with and convicted of bank fraud and aiding and abetting mail thefts. Possession of stolen mail, yes. Possession of stolen mail. Yes. I'm looking at a list of the evidence that came in in the government's case in chief and that pushes aside anything taken from the hotel room. And there were credit card checks, a whole package of information about Kimberly Nelson, which she admitted to the officers, was a made-up name. Yes. Checks that had been mailed to pay for public storage in her name. Yes. And the list kind of goes on. And the point of my question is, even if there is a problem with its use as impeachment, wasn't there substantial evidence even without the hotel room contents to satisfy the conviction, and therefore, why isn't it harmless error? That there was sufficient evidence without it, I think, is a slightly different question, Your Honor, with respect. And I wouldn't, you know, I wouldn't disagree that there was sufficient evidence without the challenged evidence. Although I would also point out, parenthetically, that also seized from Ms. Thompson's purse were false Social Security cards, a fake W-2, and a credit card in the name, I think, of Candace Gist. But the reason that the, I mean, and I think that the harmlessness portion of the analysis is, you know, the hardest. But I think that the harmlessness analysis has to take into account how damaging this other information was that the information seized from the hotel room. All of the Kimberly Nelson documents and so forth, those sort of went to Ms. Thompson, that she had made up this name, that she had bought a cell phone in this name, that she had made up this name, she had a car in this name, and so forth. But the information, the documents that were seized from the hotel room showed her in a completely other light. Not as someone who had assumed something of herself on her own behalf, but someone who was doing things that would have played into all of the fears that, you know, ordinary jurors, you know, normal members of society would have about their personal information. I mean, when you lose, when someone steals one of your checks and negotiates it, that's a loss of time to you. It could cause some level of repercussions in your life. And I don't want to say that that's not so. But when the government closed its case in chief, your client had the keys to lock that door, right? Potentially, Your Honor, yes. Not potentially. Well, she did, Your Honor, except that, you know, the only way she could put on the defense that she was putting on, which was lack of intent, lack of knowledge, was by testifying herself. And, I mean, I think that admitting that evidence for the purposes of the government's cross-examination really put her in a tight spot that either she could put on her defense and go forward with it, or she could not put on her defense and not face this evidence. I mean, look at the ---- Is there any case law that suggests that that's inappropriate? I don't know of any, Your Honor. However, I would point the Court to the Darrington case where there was a misdemeanor conviction that came in against the defendant, I presume on cross-examination, to show that it was more likely that he had committed the crime with which he was charged. The crime with which he was charged was stealing timber, essentially, from a national forest. And he had had a State permit to harvest timber on private land within the national forest, it appears. He had not only gone over the boundaries of that land belonging to his client, but in order to harvest timber and steal it from the national forest, but had also exceeded the limits of his permit as to the private land, which was a misdemeanor. I'm ---- I can't ---- I mean, I would have to look at the case again, and I don't want to, you know, mislead the Court, but I can't imagine how that conviction could have come in against him had it not ---- had he not testified. And this Court said that that misdemeanor conviction should not have come in against him precisely because, although at some level of very high level of generality they're the same thing, assault against protected timber, I believe is how the Court phrased it, that the ---- they're really not the same thing, and you need a closer connection between other acts and charged conduct for the other acts to be permissible as admissible evidence. This case is in your brief? Yes, it is. Okay. Did you want to save any time for rebuttal? Yes. Thank you. Okay. Thanks for your argument. Thank you. We'll hear from the United States at this time. Ms. Liu? May it please the Court, my name is Elaine Liu. I represent the government in this appeal. I'd like to start ---- before I start, I'd like to just clarify one point that defendant devotes some of her reply brief, and I think this would help narrow the issues for the Fourth Amendment, issues that are before the Court. The defendant has spent some time in her reply brief arguing that the incriminating nature of the documents could not have been apparent from the doorway. And based on the record before this Court, the government is not arguing otherwise. So we do have to get the officers lawfully into the room to justify their seizures. But here's why they were lawfully in the room. Not only does the defendant's reading of Randolph render the physically present language throughout the opinion mere surplusage, it goes against the rationale of Randolph. It runs counter to the social expectations that inform the Randolph opinion. Randolph discussed the social behavior of a guest standing at the door confronted with two tenants, one saying, come in, and one saying, stay out. And the Randolph ---- Is this functionally different from that? It is, Your Honor, because the calculus ---- I asked her after the traffic stop if they could search the motel room when she told them that she was living in a motel room and her kids were there, and she said no. In fact, I think she said no on more than one occasion, didn't she? The record is not clear, but even if she did say no on more than one occasion to when she was asked for permission to search ---- Well, they got her in the back of the squad car. She's under arrest. Yes. And restrained, and they knock on the door, and one or more of the kids come to the door, and they ask if they can come in, and one of them says yes? Yes. Your Honor, this is why ---- How is that functionally different if she had opened the door, and the kid had been standing next to her, and she had said no, and the kid had said yes? Well, Your Honor, the calculus of social expectations, which is what the Randolph opinion was driven by, that changes when one of the objecting tenants is not at the door. By virtue of the fact that the co-tenants have joint and equal access to the premises and they mutually ---- they have mutual, non-exclusive use of the property, when one of the tenants departs, it makes a difference. The co-tenant ---- and that's because the co-tenant who remains on site has rights, too. Those rights may be equal when the departed co-tenant is present, but when the departed co-tenant leaves, the remaining co-tenant's rights have to take priority because their shared tenancy assumes the risk that one of them will admit a guest whose presence would be obnoxious to another in the absence of that other tenant. The Randolph ---- Was Randolph on the books when this case was tried? No, it wasn't. And, in fact, it wasn't on the books when this case was tried. It was not on the books when the officers did go and get the children's consent, and it wasn't on the books during the suppression hearing. And I think that that is a very good reason why this Court should not disturb the district court's factual finding that the purpose for the officers going up to the room was not to conduct a search but to check on the well-being of the children. Because under the case law at the time within this circuit, the officer had no reason to fabricate a different reason for going into the room. Did you try the case? Yes, Your Honor. Sounds like whoever tried the case, it was you. Yes. Made an affirmative decision not to use this evidence in the case in chief. For the most part, yes. There was a little slip, and I'll get to that, but there was some mention to financial documents within the room in other people's names. So there was that reference in the government's case in chief. But for the most part, yes. Was that an opening statement, or was that actually introduced? That was during Officer Darby's testimony of what he saw in the room. But, yes, I made an affirmative decision not to admit most of the documents or any of the documents in the government's case in chief, primarily because I didn't feel that I needed it in my case in chief, and I wanted to avoid coming before this Court and litigating this issue. Can law officers circumvent Randolph by just leaving the accused who denies the right to search something, leave that person in a squad car and then go up to the room or a house or something, hope there's some underage person who could give them consent to come in? Well, under ‑‑ That's what they imply here. I'm sorry? That's what the defendant, I think, implies, that really you can't get consent from an underage person after the adult has said no. Well, there is a reference to a parent and child hierarchy in Randolph. But here is why I don't think that that hierarchy governs or changes the outcome in this case. First, the Court should consider the context in the Randolph opinion where there is that reference to the parent-child hierarchy. That reference happens when the Randolph Court is discussing to the social guest who is at the door, a disputed invitation at the door. So I would submit that a reasonable interpretation of that reference is not so much that it creates an exception to the presence requirement such that an absent parent trumps the consent of a present child, but that it instead creates an exception to the general rule that one present objecting tenant's objection suffices to exclude entry. So that if you have a present parent who consents and a present child who objects, the present parent's consent should trump. But even if the Court were to disagree with that reading of the reference to the parent-child hierarchy, in this case, factually, the children were 16 and 17 years old, very near the age of majority. And by the defendant's own testimony, this is at Appellant's Excerpts 128, the children had a key to the room and they were permitted free access within the room. And to the officers who were standing at the door, they were clearly occupying the room. The daughter answered the door and the son was sleeping on the floor next to the door. So these children who were near the age of majority certainly appeared to exercise as much dominion over the premises as their mother. So it was tantamount to having an adult in this case. And also — Kennedy. Is your case stronger if you insist that the children gave them the right to enter rather than the right to search the room? Harrington. Yes. That's another reason why the hierarchy doesn't affect the outcome here. The mother, the defendant, denied consent to search. But the officers, when they got to the door, they got a different type of consent from the daughter. They got consent to enter and speak with the daughter about their mother's arrest. I just wanted to go back and also touch on some examples that illustrate why it makes a difference that an objector be at the door. It conforts with ordinary, everyday social expectations that somebody who is not at the door and objecting cannot bar entry for guests. Take, for example, a wife and a husband who live together with their children in a home. And the husband does not get along with his mother-in-law. He makes clear to his wife and he makes clear to his mother-in-law, he tells his mother-in-law, I hate you, I hate you, I do not ever want you coming to my house. Well, if the husband is present at the house, he can enforce that rule and he can bar his mother-in-law from entering. But when he leaves the home, the wife can, out of affection for her mother or her own reasons, can invite her mother for a visit with her and her grandchildren. And that is because the wife, the co-tenant, who remains on the premises, she has rights, too, by virtue of the fact that they both have mutual, non-exclusive enjoyment at the premises. So in that factual circumstance, it's your position that the police could stop the husband outside the home immediately outside, ask for permission to search the home, be denied, knock on the door, and obtain consent from the wife. When you say immediately, if he is at the door, then no. Clearly Randolph would apply. Ten feet away. Ten feet away would be much closer to being present at the door. Okay. Do you have anything else? No, Your Honor. Thank you. Thank you. Thanks for coming in. Rebuttal? Very briefly, Your Honor. I think that when you look at the Randolph case, you're looking at a case that's all about social expectation. In its briefing, the government did a count of how often the court says at the door or physically present. But if you do a competing count for things like social expectation, ordinary custom, what is usual, and so forth, you'll get a count that's actually higher. And furthermore, that's the principle that underlies the Fourth Amendment analysis, the whole rationale, the constitutional basis of the decision. And I mean, I think that functionally to – functionally, the circumstances in this case are precisely what the Randolph court had in mind in saying that the refusal of consent of one cannot be vitiated by the grant of consent by another. And I think we put all of what we mean in our briefing, and so I don't want to take any more of the Court's time unless it has further questions. I don't see any. Thank you very much. Thank you both for coming in. The case just argued will be submitted for decision, and the Court will stand in recess for the day. Thank you very much. Your Honor. All rise. The Court is in session, Senator. Ms. Lu, what was the name of the officer who mentioned that evidence? Darby. Thank you, Your Honor.
judges: T.G. Nelson, Siler, Hawkins